Filed 3/17/14  P. v. Ramirez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARTEMIO MISAEL OROZCO RAMIREZ,<br><br>    Defendant and Appellant. | F063817<br><br>(Fresno Super. Ct. No. F10905182)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant/defendant Artemio Misael Octavio Ramirez was charged with committing four felony sexual offenses against M., a nine-year-old girl who lived in the house where he was renting a room from her family:  count I, intercourse or sodomy with

a child 10 years of age or younger (Pen. Code,[1] § 288.7, subd. (a)); count II, oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b)); count III, assault with intent to commit rape (§ 261, subd. (a)(2)); and count IV, commission of a lewd act on a child (§ 288, subd. (a)).

Defendant was arrested after the victim's family discovered sexually explicit photographs of a naked female on a cell phone which defendant had used. They believed the photographs were of the victim, based on the clothing and the body type. After defendant was arrested, he agreed to give an interview to a detective. He initially denied touching the victim, but then admitted that physical contact occurred with the victim's naked body, and claimed the victim jumped on him and took the photographs.

During the first jury trial, defendant testified and said he never touched the victim, and claimed he lied to the detective when he said some physical contact occurred between them. Defendant was convicted of counts III and IV. The jury was unable to reach verdicts for counts I and II and a mistrial was declared.

At the beginning of his second jury trial for counts I and II, it was determined that the prosecution had previously failed to disclose information to the defense that the victim had made a prior false sexual assault accusation against another man, which was unrelated to any of the charges against defendant. During the second trial, the victim was impeached with this evidence. Defendant again testified, but this time he was impeached with his two prior convictions from the first trial. Defense counsel did not object to the impeachment. Defendant was convicted of counts I and II.

After his convictions in the second trial, defendant moved for a new trial for the convictions obtained in the first trial for counts III and IV. Defendant argued the convictions were obtained in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), based on the prosecution's failure to disclose the victim's prior false accusation before

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

the first trial. The prosecution did not oppose the motion. The court granted the new trial motion as to counts III and IV. The prosecution dismissed those charges and did not retry him. However, defendant did not move for a new trial for counts I and II, even though the prosecution had used the prior convictions from the first trial to impeach his credibility at the second trial, and those convictions had been reversed because of the *Brady* error.

As a result of his convictions from the second trial, defendant was sentenced to 25 years to life for count I, and a concurrent term of 15 years to life for count II.

The instant appeal is from defendant's convictions in the second trial for count I, intercourse or sodomy with a child 10 years of age or younger, and count II, oral copulation or sexual penetration with a child 10 years of age or younger. Defendant contends his defense counsel was prejudicially ineffective for failing to object to the prosecution's use of his two prior convictions from the first trial to impeach his credibility when he testified at the second trial. Defendant argues the prior convictions from the first trial were tainted by the *Brady* error and should not have been used to impeach his credibility. Defendant also contends that defense counsel should have moved for a new trial as to all his convictions, including those from the second trial, based on the *Brady* error that occurred prior to the first trial. Finally, defendant contends the court abused its discretion during the second trial when it declined to instruct the jury about the prosecutor's delayed discovery of M.'s prior false accusation.

We will find that defense counsel was not ineffective when he failed to object to the prosecution's use of the prior convictions from the first trial, to impeach defendant's testimony at the second trial, and his failure to object was based on his reasonable tactical decisions. We will also find defendant's instructional argument is meritless. However, we will find that once the court granted a new trial for counts III and IV based on the *Brady* error in the first trial, defense counsel was ineffective for failing to move for a new trial for defendant's convictions in the second trial for counts I and II, since those prior

3.

convictions had been used to impeach his testimony in the second trial. We will find the error was prejudicial because the trial court may have granted a new trial motion for counts I and II. We will order a conditional reversal and remand for the court to consider such a new trial motion on the merits.[2]

## PART I

## FACTS OF THE CHARGED OFFENSES[3]

In 2010, Isidro and Celia A. lived in a house in Fresno County with several family members. Isidro's brother, Mo., and his nine-year-old daughter, M. (the victim), lived in a separate structure behind the house.

Defendant and his brother were farm laborers. They were not related to the A. family, but they lived in the same detached structure with Mo. and M. as tenants. Defendant had to walk through the living space of Mo. and M. to reach the room where he slept.

### Celia A. loans a cell phone to defendant

Celia A. testified she loaned an inactive cell phone to defendant. Defendant told Celia that he wanted to use the cell phone's camera to get evidence on his brother because he was beating his wife. At some later point, defendant told Celia that he had left the cell phone in the main house's bathroom when he took a shower, and someone had taken it. Defendant said he recorded something on the cell phone. Celia told him that she did not know where it was, and she would look into it.

---

[2] In part I of the factual statement, we will review the testimony from defendant's second trial regarding the substantive offenses, which is the subject of this appeal and resulted in his convictions for counts I and II. In part II, we will review the procedural history of the *Brady* violation in the first trial, and defendant's testimony in the second trial.

[3] Unless otherwise indicated, the entirety of the factual statement is from the testimony at defendant's second jury trial, which is the subject of this appeal and resulted in his convictions and sentences for counts I and II.

4.

The next day, Isidro told Celia A. that he found the cell phone in their bathroom, and he gave it to her. Isidro said defendant had activated telephone service on it without telling them.

**Discovery of the cell phone's photographs**

On or about October 12, 2010, Celia A. gave the cell phone to her adult daughter, Leticia. Leticia had previously used that cell phone to take pictures of her own children. She looked through the cell phone and discovered the pictures of her children were gone.

Celia A. and Leticia testified they discovered a series of new photographs. One photograph clearly showed defendant's face. The other photographs were sexually explicit images of a man's body and "a private part of a girl." The faces of the male and female were not visible.

However, one photograph showed a female either getting dressed or disrobing and partially showed the lower portion of the female's mouth and chin. (Exhibit No. 2.) Leticia went into M.'s closet and found the clothing depicted in that picture. Based on the clothing, Leticia and Celia A. believed M. was the female in all the sexually explicit pictures.

Celia A. testified the date stamps on the sexually explicit photographs were for the previous day. Celia knew that all of the adults had not been home that day, except for Leticia, and that M. had been "on another location on the back side of the house." Celia and Leticia told M.'s father about the photographs, and they called the police.

**M.'s initial statement**

When M. arrived home from school that day, Leticia asked M. if anything happened or anybody tried to touch her inappropriately. Leticia testified M. became "a little nervous," and looked confused, and "then she started crying and said that something had happened to her."

Leticia testified M. told her about an incident which occurred the previous day. M. said she arrived home from school, and her father was not home. Defendant offered

her candy to go in his room.  M. said she went into defendant's room, and he "took her clothes off and started kissing her whole body and then kissed her mouth."  M. said defendant put "his private spot on hers and put something nasty, so she had to go take a shower because she felt nasty."  M. said he put his private "on her," and not "in" her.  M. said he gave her a rash on her private spot.  Leticia saw a rash on that part of M.'s body.

**Defendant's initial statement**

Celia A. testified that when defendant returned home from work that day, she asked him "why he had done that to the little girl."  Defendant said he did not do anything.  Celia insisted that he did something, and defendant repeatedly denied it.  Celia asked him "who took those pictures, and he said no."  Celia insisted he took the pictures.  Defendant finally said he took the pictures, but the pictures showed him with "a woman of the street," meaning a prostitute.  Celia replied:  "That's not the body of a woman, but of a little girl."  Celia testified the police arrived and defendant did not say anything else to her.

## THE INVESTIGATION

**M.'s statement to the police**

On October 12, 2010, Fresno Police Officer Chadwick spoke to M. at her house.  Chadwick asked M. if defendant used the cell phone to take any pictures of her.  She said yes.  M. said she arrived home from school, and defendant asked if she wanted some candy.  She said yes and went into his room.  M. said defendant grabbed her arm and pulled her into his room.  He had her lay down on the bed and touched her.  Chadwick asked if defendant put his fingers inside her.  M. said yes and pointed to her vaginal and pelvic areas.

Officer Chadwick testified M. was "bashful," "hesitant," and "reluctant to answer" when they talked about the sexual touching.  Chadwick asked M. if defendant did "more touching."  M. said defendant kissed her and touched the rest of her body.  Chadwick

asked M. if defendant put anything else inside her.  M. became "even more closed to the answering," but ultimately said yes.  M. said defendant put his "private" part inside her.

Defendant was arrested that day.

**The photographs**

A forensic examiner recovered several photographs from the cell phone.  The pictures had been taken on different days.  The first picture showed a "head shot" of a "shirtless male," identified as defendant; it was taken on a different day than the other three photographs.

The examiner recovered three photographs taken within a few minutes of each other, around 6:00 p.m. on October 11, 2010.  One photograph was a close-up of a female's vaginal area.  Another picture showed a female's buttocks and "a male … penis."

The third picture showed "a female putting clothes on or taking them off."  There were two videos on the cell phone which appeared black and contained no discernible audio or video images.  There were no other images on the cell phone.

## DEFENDANT'S POSTARREST INTERVIEW

Later on October 12, 2010, Detective Rodriguez interviewed defendant after he was arrested.  Rodriguez advised defendant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and he agreed to answer questions.  The interview lasted for one hour and 16 minutes.  It was conducted entirely in Spanish and videotaped.

During the interview, Detective Rodriguez falsely told defendant they had DNA and fingerprint evidence which showed he committed the sexual acts.[4]  Defendant said he

_____

[4] Defendant has never argued that his postarrest statement was involuntary, and such an argument would not likely be meritorious.  "Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause.  [Citation.]  Why?  Because subterfuge is not necessarily coercive in nature.  [Citation.]  And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made.  [Citations.]"  (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280; *People v. Smith*

did not touch or penetrate her. Rodriguez suggested that maybe both of them wanted to do it, and that some girls want to experiment and do such things. Defendant said no.

Rodriguez asked defendant whether he should write the report to say defendant lied or he regretted it. Rodriguez said that if defendant testified and said it didn't happen, the jury would know he lied and would be mad at him.

Defendant said he had been told that the same little girl in the past had "accused another person and again now today."[5] Detective Rodriguez dismissed his comment and said defendant's DNA was inside the victim. Defendant said he did not touch or penetrate her.

Detective Rodriguez told defendant he was getting frustrated, and he would leave defendant alone in the interview room. Rodriguez said he was the only person there who spoke Spanish, and defendant would be placed in jail. Defendant again said it didn't happen. Rodriguez said defendant did it by force, and urged defendant not to take the blame if it was something they both wanted to do. Defendant said nothing happened.

Defendant said they were blaming him because he did not get along with the girl's uncle. Detective Rodriguez said it didn't matter because they had defendant's DNA. Rodriguez again advised defendant that he needed to say what happened because if he used force, "they will get you badly, seriously."

---

(2007) 40 Cal.4th 483, 505; see, e.g., *Frazier v. Cupp* (1969) 394 U.S. 731, 739 [officer falsely told the suspect his accomplice had been captured and confessed]; *People v. Jones* (1998) 17 Cal.4th 279, 299 [officer implied he could prove more than he actually could]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [officers repeatedly lied, insisting they had evidence linking the suspect to a homicide]; *In re Walker* (1974) 10 Cal.3d 764, 777 [wounded suspect told he might die before he reached the hospital, so he should talk while he still had the chance]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124-125 [officer told suspect his fingerprints had been found on the getaway car, although no prints had been obtained]; *Amaya-Ruiz v. Stewart* (9th Cir.1997) 121 F.3d 486, 495 [suspect falsely told he had been identified by an eyewitness].)

[5] Defendant's comments indicate he might have known about M.'s prior false molestation accusation.

Defendant said he came home from work, took a shower, and the cell phone was missing. He asked "the Mr." about the cell phone, and he got mad. Detective Rodriguez said he was mad because of what defendant did to the girl. Rodriguez suggested the girl was flirtatious and may have hugged or jumped on him. Defendant said the woman in the house knew the girl was flirtatious, and the girl was allowed to watch pornographic movies with "the Mr." Defendant again said he did not do anything with the girl.

Detective Rodriguez asked defendant to explain the pictures on the cell phone. Defendant said the girl used to walk in and out of his room, and she took the picture which showed his face.

Detective Rodriguez told defendant they were going to get him once they reviewed the time stamps on the pictures. Defendant said the adults were "coaching" the girl on what to say. Rodriguez said it didn't matter because the DNA was there, and he better explain whether or not it was by force. Defendant again said nothing happened.

Rodriguez said he wasn't there to "mess" him up, but the others were blaming him for raping the girl by force. Rodriguez said they would do the test, but defendant would have problems when it came back positive.

Detective Rodriguez suggested the girl wanted to do something with defendant, and that would be better than if defendant used force against her. Defendant said he let the girl borrow the cell phone, she took one picture when he was lying on his bed without his shirt on, and the other people in the house allowed her to watch pornographic movies. Rodriguez said the jury would not like to hear defendant claim that the girl watched pornographic movies, and that she started it. Defendant said the lady in the house told his sister-in-law that she saw the girl watching pornographic movies. Defendant also said the girl repeatedly walked through his room because the door did not have a lock.

Detective Rodriguez asked defendant to explain how the DNA "from her private parts got on your hands." Defendant said he was lying on the bed when the girl walked into his room. She took off her pants and "threw" herself on top of him.

9.

"[Defendant:]          And then my hand was there underneath.

"[Rodriguez:]          Underneath her private part?

"[Defendant:]          Yes."

Defendant said when the girl threw herself on his bed, he put his hand over his private area so he would not get hurt, and his hand touched her private parts. Defendant said the girl took the picture but nothing happened, and his finger did not penetrate her.

Detective Rodriguez told defendant to wait, and he left the interview room. When Rodriguez returned, he told defendant he was checking the other test results. Rodriguez asked defendant what the girl said. Defendant said she grabbed his face and kissed him. Defendant said the girl pulled down the zipper on his pants. Defendant said the girl grabbed his penis, put it in her rear private part, and she took a picture. Defendant told her no, got up, and took a shower.

Detective Cabrera entered the room, and Detective Rodriguez reported what defendant just said. Rodriguez told defendant that Cabrera had the DNA results that showed his penis went on the girl's private parts.[6]

Detective Rodriguez asked defendant if he took the picture after he penetrated the girl. Defendant said the girl took the picture, and he never penetrated her. Defendant said there was just "the slight touch and then I told her to get out."

"[Rodriguez:]          The contact was skin to skin right, your penis to her private parts right, you made contact to the skin?

"[Defendant:]          Right."

Detective Rodriguez told defendant the DNA test showed his penis touched the girl's private parts. Defendant said the test was wrong because he did not penetrate.

---

[6] There were never any DNA tests performed in this case.

Rodriguez said the results did not mean penetration, but that his penis touched her private parts. Defendant said that was correct.[7]

Detective Rodriguez said the DNA tests also showed his hand touched her private parts. Defendant said the girl grabbed him. Rodriguez asked why he did not push her away. Defendant said he could not do so.

Defendant said the girl turned his body over and she got on top of him "like [a] doggy," and took one of the pictures. Detective Rodriguez said defendant took the picture. Defendant said no, and he did not realize she had taken the picture.

Detective Rodriguez said they were going to do a test to tell if defendant was lying. Defendant said he would take the test.[8] Rodriguez said that if the test showed he was not lying, then "I will take away that charge," but if the test showed he was lying, then he would "double your charge."

Detective Rodriguez asked defendant about another sexually explicit picture on the cell phone. Defendant said it showed a girl named "Morena," who lived near the alley.

Detective Rodriguez asked defendant if he regretted touching the victim. Defendant said the girl jumped and grabbed him, he did not touch her, and he should have told her to leave.

Detective Rodriguez asked defendant what he would tell the girl if she was there. Defendant said he would tell her to stop lying about what she did, and he would apologize for "not letting the lady know" what the girl did. Defendant said he regretted that he let the girl grab his body.

---

[7] When defendant testified at trial, he said he lied when he made these inculpatory statements because he was afraid of Detective Rodriguez and just said what Rodriguez wanted to hear.

[8] A polygraph test was never administered in this case.

**Rodriguez's trial testimony about the interview**

At trial, Detective Rodriguez testified defendant seemed "pretty intelligent" during the interview, but he was not sophisticated. Rodriguez admitted he made false statements to defendant during the interview about DNA and fingerprint evidence to see his reaction. He falsely told defendant that DNA tests showed that he penetrated her.

## M.'S INTERVIEW

On October 20, 2010, M. was interviewed by law enforcement officers about whether defendant sexually molested her. The interview was videotaped.

M. said defendant lived with her family and did "something nasty" to her more than once. M. said the first incident happened when defendant came into her room. M. and her father were asleep in separate beds. Defendant went to M.'s bed, opened the blankets, got in, and he "sleep [*sic*] with me." Defendant kissed her mouth and it was "nasty." M. said defendant "made love" to her. M. was asked to explain what "making love" meant. M. said defendant kissed her mouth and "felt my parts." Defendant pulled down M.'s pajama pants and removed her underwear.

M. said defendant kissed her mouth, chest, neck, and her "little thing." M. also said defendant put his penis "inside" her and it felt "nasty." Defendant also did something to her "bottom." Defendant said, "That's good." Defendant also took her hand and put it on his private area.

M. said she pushed him away and said she did not love him. M. washed in the restroom. Defendant told M. not to tell her dad or anyone else. Defendant went back to his own room. M. said she told her cousin about it later on, and her cousin had the photographs that defendant took during this incident.

M. said that during another incident, defendant went into her room and took pictures of the "nasty" things he did to her bottom. Defendant got in her bed, kissed her mouth, chest, and private area, and "made love." He licked her private part. He put his penis "in" her private part. M. pushed him and tried to run away, but the door was

12.

locked. M. said defendant took pictures of her with the cell phone while she was asleep. She woke up and pushed him away.

**Medical evidence**

M. was examined by a family nurse practitioner, who reported her genital examination was normal. The nurse was unable to say whether or not M. had been sexually abused. M. told the nurse that defendant penetrated her body with both his penis and a finger and fondled her anal and genital areas.

**M.'S TRIAL TESTIMONY**

M., who was 10 years old at the time of second trial, testified defendant did "bad things to me" and "made love to me." Defendant "touched" her more than one time and took pictures of her with the cell phone.

M. testified about one incident when she came home from school and everyone was asleep.[9] Defendant asked if she wanted candy, and she went into his room. Defendant pushed her down on the bed and took off her clothes. He lowered his pants but kept on his shorts. He kissed her "[o]n my thing and my mouth." He "licked his finger and put it on me," inside her body. He put his tongue and penis in the private part of her bottom. He also put his penis in her private part. M. testified defendant took pictures of their bodies and private parts during this incident.

On cross-examination, M. testified defendant touched her four times. The first time it happened on his bed. It was in the daytime after she got home from school, and no one was home. They took off their clothes and he touched her.

M. testified that everyone was home during the second incident, which happened in the bedroom she shared with her father. The third incident happened at night, when

---

[9] On direct examination, M. said she could not remember what defendant did to her. The court permitted the prosecutor to use leading questions, and refresh her recollection by reviewing her prior statements about the incident.

her father was home. She could not remember which room they were in. M. testified the fourth time happened in her room, and defendant took pictures during the last incident.

Defense counsel impeached M. with her preliminary hearing testimony and prior inconsistent statements as to when, where, and how these incidents happened.

## EVIDENCE ABOUT M.'S PRIOR FALSE SEXUAL ACCUSATION[10]

Celia A., who appeared as a prosecution witness, testified she knew M. previously accused another man of sexually molesting her, and the accusation was false. M. told Celia she made the sexual molestation against the man because something happened at "Elizabeth's" house. M. claimed the man took her into a room and played pornographic movies. Celia testified the police were called about this accusation, and M. went to therapy. Celia testified M. later said she lied about "what happened at Elizabeth's house."[11]

During M.'s direct examination testimony, the prosecutor asked her about an incident in 2009, when she lived with her cousin Elizabeth. M. testified she knew men named "Pato" and "Armando" at that time. She was eight or nine years old.

The prosecutor asked M. whether, in August 2009, she told her school principal or the police that Pato did something bad to her. M. replied that she did not remember, and the man did not do anything to her. The prosecutor showed a police report to M., and M. said it was something about a movie but "nothing happened."

"Q So you told [the police] that Pato had done something inappropriate to you but he had not, is that what you're telling us now?

_____

[10] As we will explain in part II, *post*, the evidence about M.'s prior false accusation against another man was only introduced at defendant's second trial to impeach M.'s credibility. This evidence was not disclosed during defendant's first trial, and it was the subject of the *Brady* violation.

[11] Celia initially testified that M. made the false accusation against a man named "Armando," who may also have been known as "Chile Verde." On further questioning, however, she was not sure if M. made the accusation against this man or another person. Defendant testified Armando lived as a tenant in Celia's extra room before he did.

14.

"A     Yes.

"Q     Okay.  Why did you do that, M.?

"A     I don't know.

"Q     Did you have a problem with Pato, M.?

"A     Yes.

"Q     Okay.  Tell us about that.  What was the problem?

"A     He would yell at me and hit me.

"Q     And this happened at Elizabeth's house?

"A     Yes.

"Q     So that's why you told the police that Pato had touched you and done bad things to you?

"A     Yes."

The prosecutor asked M. if she was telling the truth about defendant touching her, and not making it up because she did not like defendant.  M. said she was telling the truth about defendant.  M. knew it was wrong to lie, and she came forward and admitted that nothing happened with Pato.

"[The prosecutor:]   … I'll ask you one final time, you're not making any of this up, the things that we have talked about here that [defendant] did to you; is that correct?

"A     Yes."

On cross-examination, M. testified she got along "bad" with Pato because he hit and yelled at her when no one was around.  She made up the story because she was mad at him.  M. testified she told the police that Pato took her into his bedroom, he had her sit on the bed, he held her hand, and he put on a movie with naked people.

M. testified she also told the police that Pato touched her private part where she urinated; he put tape over her mouth; and he tied her hands and feet while she was on his

15.

bed. M. said these stories were not true, and she said these things because she was mad at Pato. She got the idea to say he tied her up from something on the news.

Also on cross-examination, M. testified she actually watched a movie with Pato that showed naked people, and Pato told her not to tell her father about it. M. testified she knew what it meant to "make love," and learned the word in a book.

During rebuttal, defense counsel called Detective Alfred Lopez as a witness. Lopez testified he sat through the entirety of defendant's first trial, and he had been present during defendant's second trial as chief investigating officer. Lopez testified that he first heard about M.'s prior false molestation claim when she testified in this second case.

## EXPERT TESTIMONY

Dr. Randall Robinson testified as the prosecution expert on child sexual abuse accommodation syndrome (CSAAS). She testified CSAAS was a "descriptive term that explains why children allow themselves to be sexually abused and why they don't report it." There is a "misconception" that children act rationally, but it was "very uncommon that children report having been sexually abused." When a child actually makes such a report, the report is "generally inconsistent" and the child would not disclose everything that happened because the child would not comprehend what the perpetrator had done. Dr. Robinson explained that a child could be so overwhelmed by disclosing the sexual molestation and answering questions, that the stress makes the child say the incident was imagined or a dream.

On cross-examination, Dr. Robinson testified she would be interested to know if a child had previously made a false sexual molestation report because "it's so unusual for children to fabricate allegations of sexual abuse …." Defense counsel asked Dr. Robinson why a child would lie about sexual abuse. Dr. Robinson replied, "[G]enerally children do not lie," and she had seen examples in custody disputes and where "children

16.

lie about things that make them look good to people," but "they don't lie about something that is scary to them."

Defense counsel asked Dr. Robinson about a documented situation where a child lied about a sexual event, and then the child later reported being molested by another person, and whether "you at least have to be careful when you discuss the matter with that child and take the prior known false accusation into account." Dr. Robinson agreed, and said it was unusual because most children underreport molestation incidents, and she would have to "know so much information about that child" to know what happened.

## DEFENDANT'S TRIAL TESTIMONY[12]

Defendant testified he never touched M. in any way, he never offered candy to get her in his room, and he did not take the sexually explicit photographs found on the cell phone.

Defendant testified he borrowed the cell phone from Celia A. to photograph fights between his brother and sister-in-law. He knew an adult woman named "Morena," who was homeless and "hung out" in an alley near the house. He had a sexual relationship with Moreno in his bedroom at Celia's house. Morena used the cell phone to take a photograph of him.

Defendant said he last saw Morena on the day before he was arrested, when they had sex at Celia's house. Celia was angry about his relationship with Morena, and told him that he had to leave the house because of her.

Defendant testified that one day, he arrived home after work and left the cell phone on his bed when he took a shower in the main house. The door to his room did not lock. The cell phone was gone when he returned. Defendant testified he had a problem with M. walking in and out of his room. He denied taking any of the sexually explicit photographs on the phone, and he did not know who did it.

---

[12] Defendant testified in Spanish through a translator.

Defendant testified he was "exasperated" during the interview with Detective Rodriguez because he was arrested for something he did not do. When Rodriguez talked about the DNA, defendant thought they had "invented something" and "fabricated some evidence" because he knew he did not touch M.

Defendant testified he repeatedly told Detective Rodriguez that he did not touch M. because that was the truth. Defendant knew M. had watched pornographic movies. Rodriguez accused him of lying and said he forced himself on the girl. When Rodriguez said he was going to leave defendant alone in the room, defendant thought "nobody was going to come back for me.

Defendant testified he finally made certain admissions to Detective Rodriguez because he was afraid and thought Rodriguez was "getting angry." Rodriguez changed the way he talked to defendant because he was not "getting anything" from him. Rodriguez said he wasn't there to mess him up, but defendant thought just the opposite because Rodriguez used a Spanish word which meant "tough," or to be beaten. Rodriguez accused defendant of showing disrespect, and defendant was afraid because the police were "bad" in Mexico.

Defendant testified he was frightened when Detective Rodriguez said he would "double" the charge if he was "lying." He believed Rodriguez was going to "screw" him. Defendant felt he had to say something besides denying the charges so Rodriguez would "chang[e] his mood."

Defendant testified he lied to Detective Rodriguez when he said the girl jumped on him, grabbed his private parts, his finger and private parts touched her private parts, and she took the pictures. Defendant was "frightened" and "terrified," and he made the false statements because Rodriguez "had already gotten very angry with me" and defendant thought he could "get out of there" if he admitted something. He told Rodriguez that Morena took one of the photographs, but Rodriguez confused him when he asked about the other pictures.

18.

## Defendant's testimony about his prior convictions

As explained in the introduction, defendant's first trial resulted in his convictions for count III, assault with intent to commit rape, and count IV, commission of a lewd act on a child. The jury was unable to reach verdicts for count I, intercourse or sodomy with a child 10 years of age or younger; and count II, oral copulation or sexual penetration with a child 10 years of age or younger, and the court declared a mistrial. Defendant testified at his first trial, and he was not impeached with any prior convictions. The record implies he did not have any prior convictions when he was arrested in this case.

In defendant's second trial, which is the subject of this appeal, he was retried for counts I and II. When defendant testified at his second trial, a major portion of his testimony concerned his inconsistent statements about whether he had previously testified before a jury, and whether he had any prior convictions. The following sequence is the basis for defendant's ineffective assistance arguments in this appeal.

During direct examination at his second trial, defense counsel asked defendant if he was nervous and why. Defendant testified he was nervous because he had never appeared "before people like this," apparently referring to the jury. Defense counsel asked him if he had ever been convicted of a crime. The prosecutor objected, and the court overruled it. Defense counsel again asked defendant if he had ever been convicted of a crime in Mexico, the United States, or anywhere else. Defendant said no. Defense counsel asked if he had ever been accused of committing a sexual crime. Defendant said no.

The prosecutor objected, and the court excused the jury. The prosecutor complained defendant had just been convicted of two felonies committed against M. in the first trial, but he was falsely testifying he had never been convicted of anything. The court replied the prosecutor could impeach him on cross-examination. Defense counsel interjected: "Sure can, we can talk about the other trial." The court said if defendant wanted to put his character in evidence then he could do so, and defense counsel agreed.

19.

The court recalled the jury, and defendant's testimony continued. Defense counsel again asked defendant if he had been convicted of anything. Defendant said he had been convicted six months ago in California. Defendant explained that when he was first asked about prior convictions, he said he did not have any because he thought he was being asked about Mexico. He also thought "that maybe the jury should not know about it." Defense counsel again asked if he had previously testified, and defendant said he had testified in this case.

### *Cross-examination*

On cross-examination, the prosecutor asked defendant why he initially claimed he had never testified in a courtroom. Defendant admitted that was not true, and said he had testified before. Defendant said he "didn't know if I was to say about the other time." The prosecutor asked defendant if he understood he was under oath to tell the truth, but he did not tell the truth about testifying before. Defendant again said it was "because I didn't know if I was to say if I had been in a trial before."

The prosecutor asked defendant why he said he did not have a prior conviction, even though he had been convicted of a crime. Defendant said he had been convicted "[f]rom the last time," but "not for what is being done now." The prosecutor again asked defendant if he had just testified he had not been convicted of a crime. Defendant said yes, but "I was confused" and "I didn't know about the law." Defendant testified that from what he knew, "they did not reach a decision." Defendant also did not know whether "I should say it or not."

After further cross-examination, the prosecutor returned to this topic and asked defendant if he said that he was convicted six months ago, but he also said the jury did not reach a decision and he was not convicted. Defendant replied that he said that.

### *Redirect examination*

On redirect examination, defense counsel brought up the conviction issue.

20.

"Q     Tell the jury, please, why you said you had never been convicted by a jury in America or in Mexico?

"A     *The other day or last week I heard like the judge said that that should not be revealed about the past trial. That's why I said no.*

"Q     Okay. Were you, in fact, convicted by a previous jury of some counts related to what you're here now for?

"A     No.

"Q     Were you – were you convicted of anything in the last trial?

"A     Yes.

"Q     Okay. In the last trial were you convicted by a jury of the counts which you are now facing with this jury?

"A     No.

"Q     Okay. Is that why you said you did not have a conviction?

"A     Yes." (Italics added.)

Defendant also thought he was not supposed to reveal that he testified before the jury during the previous trial. Defendant testified he was not trying to mislead the jury but he was "just following what I had heard" from the judge.

After the parties rested, the court read the following stipulation to the jury: "[Y]ou now all know that there was a previous trial *in this case*. [Y]ou are not to speculate as to why the charges that are before you are being tried again. And in addition, you're not to speculate as to the nature of any crime that the defendant may have been convicted of in that previous trial." (Italics added.)

**Closing arguments**

The prosecutor did not address defendant's prior convictions in her initial closing argument.

In his closing argument, defense counsel reminded the jury that he asked defendant if he had ever testified or been convicted of a crime. Defense counsel declared defendant thought the judge told him not to talk " 'about that prior jury' " and " 'the other

21.

one.' " Defense counsel argued the prosecutor unfairly "jumped on" defendant's confusion and made the jury think defendant was deliberately lying, when he thought he was following the court's orders. Counsel continued:

> "So now you know it. I mean, it's out there. *He was tried by another jury and they hung*. That's – we have talked about it. That's evidence. He thought he didn't have a conviction. He thought he was told not to talk about it." (Italics added.)

In her rebuttal, the prosecutor relied on the prior convictions to attack defendant's credibility, and asserted defendant repeatedly lied to the jury about everything:

> "… I'm going to say to you that he lied to you. I'm just going to straight out say it. He lied to you again and again and again."

The prosecutor cited defendant's claim that he thought he was following the court's orders not to mention his prior convictions, and added:

> "… [Defendant] was not following orders to tell you that he had never been convicted or testified before. There was no order from this court that you not be told that."

Defense counsel objected. The court overruled the objection and instructed the jury that it heard the evidence; it could decide what it heard; and counsel could argue what they believed the evidence showed. The prosecutor continued and again asserted there was never a specific order not to talk about it.

The prosecutor moved on to other matters, particularly M.'s credibility and the impact of her prior false molestation accusation against another man. The prosecutor argued M.'s allegations against defendant were still credible because of the cell phone pictures and defendant's statements to the police. The prosecutor then returned to defense counsel's statements about the first trial.

> "[W]hen I was talking about defendant's testimony of whether or not he had been convicted *and counsel said he was tried and they hung*. There is a little more to that. *They did hang, but there was also a conviction*. And you heard me get that from defendant, although he backtracked on that, but there was a conviction as well." (Italics added.)

22.

Defense counsel did not object to the prosecutor's final argument.

## Verdict and sentence

After the second trial, defendant was convicted of count I, intercourse or sodomy with a child 10 years of age or younger; and count II, oral copulation or sexual penetration with a child 10 years of age or younger.

## PART II

## PROCEDURAL HISTORY OF *BRADY* ERROR

As explained above, defendant repeatedly sought discovery as to whether M. made a prior false molestation accusation against another man. During the first jury trial, the prosecutor advised the court there was no evidence of such an accusation. At the beginning of the second jury trial, however, the prosecutor advised the court that such evidence existed, and conceded *Brady* error had occurred during the first trial because of the failure to disclose this evidence.

The procedural history of the *Brady* error begins before defendant's first trial and continues after his convictions in the second trial. The instant appeal concerns defendant's convictions from the second trial, and there was no *Brady* error in that proceeding since the evidence about M.'s prior false accusation was admitted. The However, the procedural history of the *Brady* error is critical because it is the basis for defendant's appellate claim that his defense attorney was prejudicially ineffective during the second trial, when he allowed defendant's credibility to be impeached with the convictions from the first trial which had been obtained in violation of *Brady*.

## *Brady* error

We begin with a brief review of *Brady*, *supra*, 373 U.S. 83. "In *Brady,* the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has since held that the duty to disclose such evidence exists

23.

even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] In order to comply with *Brady,* therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' [Citations.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042; see also *Youngblood v. West Virginia* (2006) 547 U.S. 867, 869-870; *Strickler, supra,* 527 U.S. 263, 280-281.)

As we will further discuss in issue I, *post*, the suppression of evidence in violation of *Brady* violates a defendant's constitutional right to due process. (*Brady*, *supra*, 373 U.S. at p. 87; *Strickler*, *supra*, 527 U.S. at p. 280.) The use of a constitutionally invalid prior conviction for impeachment purposes is error of constitutional dimension. (*United States v. Brito-Hernandez* (5th Cir. 1993) 996 F.2d 80, 81-82.)

With this background in mind, we turn to the procedural history of the *Brady* error, which begins prior to the first trial and continues through the second trial.

**Defendant's discovery request**

On October 12, 2010, defendant was arrested. On February 7, 2011, defense counsel wrote to the prosecution and requested information about "the prior case(s) in which the alleged victim was the complaining witness," based on counsel's information that M. had previously claimed she was molested by another man.

The defense did not receive a written response to this discovery request. According to defendant, the prosecutor made certain off-the-record representations to defense counsel before the first trial, that the lead investigator reported the requested information did not exist and a prior incident did not occur.

24.

**Defendant's first trial and the evidentiary hearing**

On February 22, 2011, defendant's first trial began before Judge Vogt on the four charged felonies. The court conducted an evidentiary hearing on defendant's motion to introduce evidence that M. had made prior false sexual molestation accusations against another man. Defendant's brother and sister-in-law testified that Celia A., M.'s aunt, told them the girl made a prior false accusation of being molested by another man who rented a room in the house. They did not have personal knowledge of this incident.

The court held the proposed testimony was inadmissible hearsay and could not be used to impeach M.'s credibility. However, the court acknowledged the potential admissibility of a prior false molestation claim, and that it might permit testimony from a witness with personal knowledge of such an accusation. The court reminded the prosecutor of her obligations under *Brady*, *supra*, 373 U.S. 83 and asked if she conducted "a due diligence search to determine if anybody has been accused of sexual assault by this victim." The prosecutor stated she checked "our system" and did not find any evidence about M.

During the first trial, neither M. nor any other witness testified about whether she made any prior sexual molestation allegations, and M.'s credibility was not impeached on this point. Defendant testified and he was not impeached with any prior convictions. Defendant was convicted of count III, assault with intent to commit rape; and count IV, commission of a lewd act on a child. The jury was unable to reach verdicts on counts I and II, and the court declared mistrials as to those counts.

**Defendant's second trial and the evidentiary hearing**

On September 27, 2011, defendant's second trial began before Judge Ellison for count I, intercourse or sodomy with a child 10 years of age or younger; and count II, oral copulation or sexual penetration on a child 10 years of age or younger. Defendant again moved to introduce evidence about M.'s alleged prior false molestation accusation, but

25.

conceded he had not discovered any witnesses with personal knowledge of these issues since the first trial.

On September 29 and 30, 2011, the court conducted an evidentiary hearing on defendant's motion. The court heard testimony from defendant's brother and sister-in-law during a closed hearing. The court also heard testimony from Celia A. about her personal knowledge regarding M.'s prior false report. The court submitted the matter until Monday, October 3, 2011.

**Disclosure of *Brady* evidence**

On or about Friday, October 1, 2011, the prosecutor advised defense counsel that she discovered evidence that M. made a false sexual molestation allegation against another man in 2009. The prosecutor turned over police investigative reports about the false accusations.

On Monday, October 3, 2011, the court conducted a hearing outside the jury's presence. The prosecutor advised the court that she conducted further research and determined M. made a report to the police in 2009, that she was sexually molested by another man, and the report turned out to be false. The court held the evidence was admissible and went "right to the heart" of whether M. made up the pending charges against defendant. The court held the defense could ask Celia A. and M. about the prior false report.

As set forth in the factual statement, both Celia A. and M. testified for the prosecution at the second trial, and the prosecutor asked both witnesses about M.'s prior false report. Defense counsel extensively cross-examined M. about the nature and circumstances of the false accusation.

Also as discussed, *ante*, defendant testified at the second trial and his credibility was impeached with his prior convictions from the first trial.

**Motion for new trial for counts III and IV from the first trial**

After defendant was convicted of counts I and II in his second trial, he filed a motion for new trial only as to his convictions in the first trial for counts III and IV. Defendant argued his convictions in the first trial were obtained in violation of his constitutional right to due process based on the *Brady* violation. Defendant argued the evidence about M.'s prior false accusation was material because it would have undermined M.'s credibility in the first trial, the prosecution was responsible for law enforcement's failure to comply with discovery, and an alleged negligent failure to disclose still violated *Brady*. Defendant further argued the disclosure of this evidence would have changed the defense strategy in the first trial about how to impeach M.'s credibility.

On November 9, 2011, Judge Vogt, who presided over defendant's first trial, heard defendant's motion for new trial. The prosecutor did not file opposition and did not offer argument against it "based on the subsequent verdict and our in-chambers discussion."

The court granted a new trial for defendant's two convictions from the first trial: count III, assault with intent to commit rape; and count IV, commission of a lewd act on a child.

Defendant did not file a motion for new trial as to his convictions for counts I and II from his second trial, or argue that the prosecution's use of his convictions from his first trial were improperly used to impeach his testimony in the second trial.

**Sentencing hearing for second trial**

On November 16, 2011, Judge Ellison conducted the sentencing hearing for defendant's convictions for counts I and II from the second trial. Defendant was sentenced to 25 years to life for count I, with a concurrent term of 15 years to life for count II.

The court granted the People's motion to dismiss counts III and IV, which had been the subject of the new trial motion, and he was not retried for those charges.

Defense counsel did not ask the court to consider a motion for new trial for counts I and II from the second trial, even though the convictions from the first trial, which had been used to impeach him, had been reversed for *Brady* error.

## DISCUSSION

### I.     Ineffective assistance; impeachment of defendant's trial testimony

Defendant contends defense counsel was prejudicially ineffective for not objecting when the prosecutor impeached his testimony at his second trial with his two prior convictions from the first trial. Defendant argues that by the time he took the stand at his second trial, defense counsel was aware the prosecutor violated *Brady* during the first trial by failing to discover and disclose the police reports about M.'s prior false molestation allegation. Defendant asserts defense counsel should have objected to the prosecutor's use of the convictions from the first trial to impeach his credibility since those convictions were obtained in violation of his constitutional rights based on the *Brady* error. The People argue defense counsel made a reasonable tactical decision not to object to the impeachment based on the unique procedural circumstances of the two trials.

#### A. Ineffective assistance

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.)

28.

Defendant's ineffective assistance contentions are based on defense counsel's failure to object. "Failure to object rarely constitutes constitutionally ineffective legal representation [citation]...." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

### B. The jury verdicts from the first trial were "prior convictions"

We begin briefly with an issue not specifically addressed by the parties but raised by the unique procedural history of this case: whether the jury's guilty verdicts in the first trial constituted "prior convictions" that could be used to impeach defendant's credibility when he testified in the second trial, even though the case was not final.

"Evidence Code section 788 provides that the credibility of a witness may be attacked by showing a witness has been convicted of a felony. [T]he term 'convicted' includes otherwise qualifying felony convictions suffered even though sentence has not yet been imposed on the charge." (*People v. Martinez* (1998) 62 Cal.App.4th 1454, 1457; see also *People v. Rogers* (2013) 57 Cal.4th 296, 344.) A defendant may be impeached by prior convictions resulting from a guilty verdict or a jury's adjudication of guilt even if the defendant has not been sentenced, and in the absence of an appealable final judgment. (*People v. Martinez, supra*, 62 Cal.App.4th at pp. 1460-1464.)

At the time of defendant's second trial, defendant had been convicted by a jury of counts III and IV in the first trial, but he had not been sentenced for those convictions. Nevertheless, the jury's guilty verdicts on the two counts from the first trial were "prior convictions" and could be used to impeach defendant's credibility when he testified in the second trial, even though he had not been sentenced, the court had not heard any postverdict motions, and the judgment was not final.

29.

## C. The *Brady* violation

While the two prior convictions from the first trial were available to impeach defendant's credibility when he testified, the next question is whether those convictions were obtained as a result of the *Brady* error, and defense counsel should have objected to impeachment based on that issue.

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  (*Strickler*, *supra*, 527 U.S. at pp. 281-282; *People v. Salazar*, *supra*, 35 Cal.4th 1031, 1043.)

"A prosecutor has a duty to search for and disclose exculpatory evidence if the evidence is possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work.  The important determinant is whether the person or agency has been 'acting on the government's behalf' [citation] or 'assisting the government's case.'  [Citation.]" (*People v. Superior Court* (2000) 80 Cal.App.4th 1305, 1315; *Strickler*, *supra*, 527 U.S. at p. 281; *In re Brown* (1998) 17 Cal.4th 873, 879.)  "[I]nformation possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material.  (*People v. Superior Court*, *supra*, 80 Cal.App.4th at p. 1315.)

Suppression of such evidence violates due process "irrespective of the good faith or bad faith of the prosecution" (*Brady*, *supra*, 373 U.S. at p. 87), and "regardless of whether it was intentional, negligent, or inadvertent.  [Citations.]"  (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1225.)

"[E]vidence tending to impeach the credibility of a prosecution witness may be deemed favorable to the defense under *Brady*."  (*People v. Ashraf* (2007) 151

Cal.App.4th 1205, 1214; see also *United States v. Bagley* (1985) 473 U.S. 667, 676; *People v. Kasim* (1997) 56 Cal.App.4th 1360, 1380.) In contrast, undisclosed impeachment evidence is not material under *Brady* if it would not have added significantly to the cumulative aspect of other impeachment evidence already presented. (*People v. Dickey* (2005) 35 Cal.4th 884, 907-909.)

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' [Citations.]" (*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434.) The "touchstone of materiality is a 'reasonable probability' of a different result .… The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [Citation.]" (*Id.* at p. 434.)

### 1. *Analysis*

Defendant's constitutional right to due process under *Brady* was violated in the first trial. The evidence of M.'s prior false molestation accusation was favorable and material to the defense because it impeached the credibility of the alleged victim of the charged offenses. The evidence was in the possession of the investigating agency. It would not have been cumulative since M.'s testimony at the first trial was not impeached with any evidence about a prior false report, and the court properly excluded defendant's offer of proof as hearsay. The evidence was "suppressed," apparently inadvertently, because of the detective's alleged reliance on an erroneous birthday and last name for M. when he researched the matter, despite defense counsel's repeated insistence that such a prior false report existed. Thus, defendant's due process rights were violated under

*Brady* even if the failure to disclose was inadvertent and not in bad faith. (*Brady*, *supra*, 373 U.S. at p. 87; *In re Sodersten*, *supra*, 146 Cal.App.4th at p. 1225.)

Defendant suffered prejudice as a result of the *Brady* error in the first trial because he did not receive a fair trial, i.e., "a trial resulting in a verdict worthy of confidence." (*Kyles v. Whitley*, *supra*, 514 U.S. at p. 434.) M. testified about her allegations against defendant without the jury learning that she had made a false sexual molestation allegation against another man who had lived with her, and that her prior false allegations featured rather lurid details.

"[T]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called '*Brady* material' – although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler*, *supra*, 527 U.S. at p. 281.)

Defendant's first trial was obviously the exception to this rule because a "real '*Brady* violation' " occurred, material evidence was suppressed, and his convictions in counts III and IV were obtained in violation of his constitutional right to due process of law. (*Strickler*, *supra*, 527 U.S. at p. 281.) Indeed, the prosecution conceded as much since it did not file any opposition to defendant's motion for new trial, and the court granted the motion because of the impact of the *Brady* error on the convictions from the first trial. (*Ibid.*)

### D. Impact of *Brady* error on the second trial

While the first trial may have been tainted by the *Brady* error, there was no *Brady* violation in the second trial (which is the subject of this appeal) since the evidence of M.'s prior false accusation was disclosed and introduced to impeach her credibility at the second trial. Evidence ultimately presented at trial is not considered suppressed for

32.

*Brady* purposes, even if the evidence was not disclosed during discovery. (*People v. Verdugo* (2010) 50 Cal.4th 263, 282; *People v. Morrison* (2004) 34 Cal.4th 698, 715.)

Instead, defendant's ineffective assistance claim is based on defense counsel's failure to object to the prosecutor's use of his prior convictions from the first trial to impeach his testimony at the second trial. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

In this case, however, an objection in the second trial to the use of the prior convictions for impeachment, based on the impact of the *Brady* violation in the first trial, might well have been meritorious. The suppression of evidence in violation of *Brady* violates a defendant's constitutional right to due process. (*Brady*, *supra*, 373 U.S. at p. 87; *Strickler*, *supra*, 527 U.S. at p. 280; *People v. Salazar*, *supra*, 35 Cal.4th 1031, 1042.) "It is well established that 'the use of constitutionally invalid prior convictions for impeachment purposes is error of constitutional dimension.' [Citation.]" (*United States v. Brito-Hernandez*, *supra*, 996 F.2d at pp. 81–82; see also *Loper v. Beto* (1972) 405 U.S. 473, 483–484; *Bates v. Nelson* (9th Cir. 1973) 485 F.2d 90, 95; *In re Rogers* (1980) 28 Cal.3d 429, 434; *People v. Coffey* (1967) 67 Cal.2d 204, 218–219, reversed on other grounds in *Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1304, fn. 7; *In re Dabney* (1969) 71 Cal.2d 1, 3, 6.)

By the time defendant testified at the second trial, defense counsel was aware that defendant's prior convictions from the first trial were likely tainted by the *Brady* violation. An objection based on the *Brady* violation would not have been meritless, and would have required the court to address the issue and perhaps limit the use of those convictions to impeach defendant's trial testimony.

### E. Defense counsel's tactical decisions

Defendant asserts defense counsel was prejudicially ineffective for failing to rely on the *Brady* violation and object to the prosecutor's use of the prior convictions from the

first trial to impeach his testimony at the second trial. There was more to this case, however, than defense counsel's failure to object to the impeachment evidence. The entirety of the record suggests defense counsel believed it somehow would have been beneficial for the jury to learn some details about what happened at the first trial – in order to undermine the credibility of M.'s testimony about the specific counts which were before the jury.

When defendant began his testimony at the second trial, defense counsel asked him whether (1) he had ever testified before a jury; (2) he had any prior convictions; and (3) whether he had ever been charged with any type of sexual charges. Defendant replied no to each question. The prosecutor immediately objected and advised the court that defendant testified at the first trial and had two prior convictions for sexual assault. The court replied that the prosecutor could use the prior convictions from the first trial to impeach defendant since defendant had opened the door to impeachment. Defense counsel did not raise any objections to the prosecutor's stated intent to impeach defendant with the prior convictions from the first trial. Instead, defense counsel replied: "Sure can, we can talk about the other trial." (RT 4040-4041)

Defense counsel's examination of defendant sheds some light on his possible tactical reasons for allowing the jury to learn that defendant had prior convictions which were likely based on similar charges involving the same victim. The following sequence is particularly illuminating:

> "[DEFENSE COUNSEL]: Okay. Were you, in fact, convicted *by a previous jury of some counts related to what you're here now for?*
>
> "[DEFENDANT]: No.
>
> "Q     *Were you – were you convicted of anything in the last trial*?
>
> "A     Yes.
>
> "Q     Okay. In the last trial were you convicted by a jury of the counts which you are now facing with this jury?

34.

"A     No.

"Q     Okay.  Is that why you said you did not have a conviction?

"A     Yes."  (Italics added.)

After the parties rested, the court read the following stipulation to the jury:  "[Y]ou now all know that there was a previous trial *in this case*.  [Y]ou are not to speculate as to *why the charges that are before you are being tried again*.  And in addition, you're not to speculate as to the nature of any crime that the defendant may have been convicted of in that previous trial."  (Italics added.)  Defense counsel did not object to this instruction.

Defense counsel's closing argument sheds further light on his possible tactical decisions in this case.  Counsel reminded the jury that he asked defendant if he had ever testified or been convicted of a crime.  Defense counsel declared defendant thought the judge told him not to talk " 'about that prior jury' " and " 'the other one.' "  Defense counsel argued the prosecutor unfairly "jumped on" defendant's confusion and made the jury think defendant was deliberately lying, when he thought he was following the court's orders.  Counsel continued:

> "So now you know it.  I mean, it's out there.  *He was tried by another jury and they hung*.  That's – we have talked about it.  That's evidence.  He thought he didn't have a conviction.  He thought he was told not to talk about it."  (Italics added.)

In her rebuttal, the prosecutor relied on the prior convictions to attack defendant's credibility:  "… I'm going to say to you that he lied to you.  I'm just going to straight out say it.  He lied to you again and again and again."  The prosecutor cited defendant's claim that he thought he was following the court's orders not to mention his prior convictions, and added:

> "… [Defendant] was not following orders to tell you that he had never been convicted or testified before.  *There was no order from this court that you not be told that*."  (Italics added.)

Defense counsel objected.  The court overruled the objection and instructed the jury that it heard the evidence; it could decide what it heard; and counsel could argue

what they believed the evidence showed.  The prosecutor continued and again asserted there was never a specific order not to talk about it.

The prosecutor moved on to other matters, particularly that M.'s allegations against defendant were still credible, despite her prior false accusations, because of the cell phone pictures and defendant's statements to the police.  The prosecutor then returned to defense counsel's statements about the first trial.

> "[W]hen I was talking about defendant's testimony of whether or not he had been convicted *and counsel said he was tried and they hung*.  There is a little more to that.  *They did hang, but there was also a conviction.*  And you heard me get that from defendant, although he backtracked on that, but there was a conviction as well."  (Italics added.)

### F.  Analysis

In evaluating defendant's claim of ineffective assistance, we defer " 'to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.]  '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)

The decision whether to object to the admission of evidence is "inherently tactical," and a failure to object will rarely reflect deficient performance by counsel. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.)  "[Defendant] must affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. [Citations.]" (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.)

36.

"There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 689-690.) " '[E]ven "debatable trial tactics" do not "constitute a deprivation of the effective assistance of counsel." [Citations.]' [Citation.]" (*People v. Weaver, supra*, 26 Cal.4th 876, 928.)

As the People suggest, there is a tactical explanation for defense counsel's decisions in this case. As we have already explained, the jury's verdicts in the first trial constituted prior convictions which could be used to impeach defendant's credibility when he testified at the second trial. Based on defense counsel's statements to the court, he believed the entire case hinged on the jury's evaluation of M.'s credibility. Counsel also knew the prior convictions were potentially admissible, and he sought to preempt the prosecutor's anticipated impeachment by disclosing the prior convictions to the jury during defendant's direct examination. Counsel's comments to the court reflect his belief that it would help defendant if this jury also learned that another jury had been unable to convict defendant of similar charges which were now before it. The crucial point would have been that another jury had not believed M.'s testimony about the specific sexual acts which defendant was accused of committing. Such an inference would have been further bolstered by the impeachment evidence against M. about her prior false molestation accusation. This reasonable tactical decision serves to explain defense counsel's willingness to allow the jury to hear about the first trial, his decision not to object to the prosecutor's use of the prior convictions to impeach defendant's testimony at the second trial, and the nature of his closing argument.

We conclude defense counsel was not ineffective during the evidentiary portion of the second trial. He made a reasonable tactical decision not to object to the impeachment of defendant's testimony with the two prior convictions from the first trial, given the unique procedural circumstances of this case.

**II.** **Defense counsel's failure to move for a new trial as to counts I and II**

Defendant asserts that aside from defense counsel's actions at trial, counsel was separately ineffective for failing to make a motion for new trial as to counts I and II. Defendant is correct.

As we have explained, defense counsel made the reasonable tactical decision during the evidentiary portion of the second trial, to allow the jury to learn about the prior convictions from the first trial, and not to object when defendant was impeached with counts III and IV. More importantly, defense counsel was determined for the jury to learn that another jury had been unable to convict defendant of similar charges. Defense counsel's tactical decisions were reasonable even though the prior convictions may have been tainted by the *Brady* violation in the first trial.

After defendant was convicted in the second trial of counts I and II, however, the reason for defense counsel's tactical decision ceased to exist. It was at that point when defense counsel properly moved for a new trial before Judge Vogt as to counts III and IV from the first trial, based on the *Brady* violation. The prosecution did not oppose the motion, the court granted the new trial, and the prosecution later decided not to retry defendant for counts III and IV.

Once Judge Vogt granted defendant's new trial motion for counts III and IV based on the *Brady* violation, there was no tactical reason defense counsel should not have moved for a new trial for counts I and II from the second trial. The suppression of evidence in violation of *Brady* violates a defendant's constitutional right to due process. (*Brady*, *supra*, 373 U.S. at p. 87; *Strickler*, *supra*, 527 U.S. at p. 280.) The use of a constitutionally invalid prior conviction for impeachment purposes is error of constitutional dimension. (*United States v. Brito-Hernandez, supra,* 996 F.2d 80, 81-82; *Bates v. Nelson* (9th Cir. 1973) 485 F.2d 90, 95; *People v. Coffey* (1967) 67 Cal.2d 204, 218-219.) Based on Judge Vogt's decision to grant a new trial as to counts III and IV because of the *Brady* violation in the first trial, defense counsel should have filed a

38.

motion for new trial before Judge Ellison, and argued defendant's convictions in counts I and II in the second case were tainted because his trial testimony was impeached with prior convictions which were constitutionally invalid.

"No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; *People v. Braxton* (2004) 34 Cal.4th 798, 815.)

Based on the record before this court, we believe that a motion for new trial as to counts I and II might have been meritorious, and defense counsel was prejudicially ineffective for failing to make such a motion. However, we cannot say that the trial court should have granted a new trial motion on the merits. We believe it would be more appropriate to conditionally reverse and remand the matter for defendant to make the appropriate new trial motion as to counts I and II, based on the impact of using the constitutionally invalid prior convictions to impeach his testimony at the second trial.

A motion for new trial may be based on federal constitutional error. (See *People v. Homick* (2012) 55 Cal.4th 816, 894; *People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27, reversed on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.) Upon such a motion, the superior court must determine whether the use of the defendant's constitutionally invalid prior convictions was harmless beyond a reasonable doubt, pursuant to *Chapman v. California* (1967) 386 U.S. 18, 24. (*United States v. Brito-Hernandez, supra,* 996 F.2d 80, 81–82; *People v. Alvarez* (1996) 14 Cal.4th 155, 216, fn. 21.)

We believe this remedy is appropriate so the new trial motion may be brought and heard before the same court which presided over defendant's second trial, in order for that court to consider defendant's legal and factual contentions. (See, e.g., *People v.*

39.

*Drake* (1992) 6 Cal.App.4th 92, 97-98; *People v. Braxton, supra*, 34 Cal.4th 798, 818–819.)  If the court denies the new trial motion, the court shall reinstate defendant's convictions for counts I and II.  If the court grants the motion, defendant may be retried.

## III.  The court's denial of defendant's motion for CALCRIM No. 306

Defendant's final issue is based on the court's alleged instructional error at the second trial.  However, his assignment of error is partially based on the *Brady* violation which occurred during the first trial.

Defendant contends that when the court instructed the jury in the second trial, it should have granted his request to give CALCRIM No. 306 as a sanction for the prosecution's belated disclosure of M.'s prior false molestation accusation.  We will find the court did not abuse its discretion when it declined to give the instruction.

### A.  Instructional request during the second trial

As explained, *ante*, the evidence about M.'s prior false accusation was not disclosed during the first trial, and M. was not impeached with this information.

At the beginning of the second trial, the prosecution belatedly disclosed this evidence to the defense.  During the second trial, M. was impeached with this evidence, and Celia A. was questioned about M.'s prior false statements.  As we have explained, there was no *Brady* violation during the second trial because the evidence about M.'s prior false molestation claim was introduced before the jury.

After the parties rested at the second trial, defense counsel requested the court to give CALCRIM No. 306, as a sanction for the prosecution's belated discovery of the evidence regarding M.'s prior false molestation allegation.  The pattern instruction states in relevant part:

> "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law.  Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.

"An attorney for the [People] failed to disclose: *<describe evidence that was not disclosed>* [within the legal time period].

"In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure…."

The prosecutor conceded the evidence about the prior false report was *Brady* material, but there was no evidence of a willful discovery violation. The prosecutor explained the investigative reports about M.'s prior false accusation was entered into the police department's computer system using an incorrect last name and birth date for her, and the detectives finally connected M. to the prior case after the second trial's evidentiary hearing.

The court denied defendant's request for CALCRIM No. 306 as a sanction for the discovery violation. The court stated a continuance would have been the appropriate remedy for the delayed discovery but defendant never asked for a continuance. The court asked defense counsel to explain why he was prejudiced by the delayed discovery, particularly since M. testified and admitted she made the prior false allegation.

Defense counsel said he did not want a continuance in the middle of trial, and the delayed discovery did not give him time to investigate why M. made the false allegation, or to have a defense psychologist investigate and explain why a child would make a false allegation. Counsel argued CALCRIM No. 306 could be given without showing prejudice from the delayed discovery.

The prosecutor clarified that when she turned over the *Brady* evidence to defense counsel at the beginning of the second trial, they discussed a possible continuance, and she would not have objected to his request. However, defense counsel never asked for a continuance. In addition, defense counsel always appeared to know about M.'s prior false allegation based on his efforts to introduce evidence about it before both trials, so the subsequent disclosure of the *Brady* evidence was not a complete surprise.

41.

The court again denied defendant's request for the instruction. The court agreed the evidence about M.'s prior false report was "*Brady* information," but found there was no prejudice, or "willful" or "technical suppression" of the evidence.

> "And the need to sanction the People, there really isn't any need for that. The purpose of a sanction, it seems to me, is to punish behavior so that it's not repeated. And this is a circumstance in which the parties simply, while they should have produced it, had it been known that [M.] had another [last] name and had made a report using another name, it wasn't. And there is no point in a punishment in those circumstances, in this Court's view."

## B. Section 1054.1

Defendant's motion for the court to give CALCRIM No. 306 was based on the prosecutor's belated disclosure of evidence at the beginning of the second trial and alleged violation of the reciprocal-discovery statute. The constitutional duty that requires prosecutors to disclose exculpatory evidence to criminal defendants under *Brady* is independent from the statutory duty to provide discovery under section 1054.1. (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378; *People v. Jordan* (2003) 108 Cal.App.4th 349, 359.)

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense, ... certain categories of evidence "*in the possession of the prosecuting attorney or [known by] the prosecuting attorney ... to be in the possession of the investigating agencies*." ' [Citation.] Evidence subject to disclosure includes '[s]tatements of all defendants' [citation], '[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' [citation], any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts' [citation], and '[a]ny exculpatory evidence' [citation]. 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. [Citation.]' [Citation.]" (*People v. Verdugo*, *supra*, 50 Cal.4th at pp. 279-280, italics added.)

"Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, ... continuance of the matter, or any other lawful order.' [Citation.] The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' [Citation.] A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 …. [Citation.]" (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 280.)

The court has discretion to consider a wide range of sanctions for a violation of section 1054.1, including giving CALCRIM No. 306. (See, e.g., *People v. Riggs* (2008) 44 Cal.4th 248, 306-310; *People v. Thomas* (2011) 51 Cal.4th 449, 484, fn. 6.) The court's ruling on discovery sanctions is reviewed under an abuse of discretion standard. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

## C. <u>Analysis</u>

The court did not abuse its discretion when it denied defendant's motion to give CALCRIM No. 306 at the second trial. First, section 1054.1 requires disclosure of information the prosecutor possesses or knows to be in the possession of the investigating agency. In this case, the prosecutor represented during the first trial that she had checked the system and could not find any prior reports about M. The *Brady* error was subsequently disclosed at the beginning of the second trial, and the prosecutor explained the detective used an incorrect birth date and last name for M. when he initially researched the issue. The court found the *Brady* error was inadvertent and unintentional, there is no evidence to the contrary, and defendant did not challenge the court's findings on that point. The prosecutor did not violate the criminal discovery statute, and the court did not have the duty to instruct the jury on the untimely discovery.

Second, we have already explained a negligent or inadvertent failure to disclose still constitutes a *Brady* violation, and the failure to disclose M.'s prior false allegation

43.

was *Brady* error as to the first trial. However, it is important to note the *Brady* error was discovered at the beginning of the second trial, and the evidence was fully disclosed to the defense. Both the court and the prosecutor were agreeable to a continuance, but defense counsel did not request or desire a continuance. The evidence about M.'s prior false accusation was introduced at the second trial, and M. was extensively cross-examined about that accusation. Evidence ultimately presented at trial is not considered suppressed for *Brady* purposes, even if the evidence was not disclosed during discovery. (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 282; *People v. Morrison* (2004) 34 Cal.4th 698, 715.)

Finally, defense counsel had been aware of rumors about M.'s prior false accusation from the beginning of this case, demanded disclosure of the evidence, and moved to introduce hearsay testimony about the incident. Prior to both trials, the court conducted evidentiary hearings on the admissibility of the defense hearsay evidence, leading to the inference that defendant was prepared to address the issue if the court admitted the evidence. The prior false report was ultimately disclosed during the course of the evidentiary hearing at the second trial. It is reasonable to conclude that defendant was prepared to address this incident at trial since he was waiting for the court's ruling on the admissibility of the hearsay evidence about the prior false claim. Defendant never made an offer of proof as to whether he would have introduced additional evidence regarding the prior false claim at the second trial.

The court did not abuse its discretion when it declined to give CALCRIM No. 306 about the belated disclosure of M.'s false claim at the second trial.

## DISPOSITION

For the reasons stated, the judgment is reversed and the matter remanded to the trial court for consideration of a motion for a new trial, based on the introduction of the convictions from the first trial in the second trial. At the conclusion of the hearing, if the trial court denies the motion for a new trial, the trial court is directed to reinstate the

44.

judgment, which shall stand affirmed. If the trial court grants a new trial, the judgment shall stand reversed and defendant may be retried.

_____
Poochigian, J.

WE CONCUR:

_____
Cornell, Acting P.J.

_____
Franson, J.